# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                      No. CR 10-2460 JB

DERRICK JONES YAZZIE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the before the Court on the Defendants' Objections to the Presentence Report and, in the Alternative a Request for a Downward Departure and Variance, filed April 26, 2011 (Doc. 32)("Objections to PSR").   The Court held evidentiary sentencing hearings on May 27, 2011 and July 28, 2011.  The primary issues are whether Defendant Derrick Jones Yazzie: (i) destroyed Herman Tom's residence; (ii) attempted to destroy Herman Tom's residence; or (iii) knowingly created a  substantial risk of death or serious bodily injury to another person. Because the Court finds that Plaintiff United States of America has not, by a preponderance of the evidence, made any of these three showings, the Court will sustain D. Yazzie's objections in part and will find that his base offense level should be 20 pursuant to U.S.S.G. § 2K1.4(a).[1]

## FINDINGS OF FACT

Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure states that the Court "must -- for any disputed portion of the presentence report or other controverted matter -- rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or

---

[1]If necessary, the Court will address D. Yazzie's request for a downward departure and a variance at the sentencing hearing and in a subsequent sentencing memorandum.

because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 32(i)(3)(B). In making these findings, the rules of evidence do not bind the Court. See Fed. R. Evid. 1101(d)(3); United States v. Graham, 413 F.3d 1211, 1221 n.10 (10th Cir. 2005)("In any event, the Federal Rules of Evidence are not applicable to sentencing proceedings.")(citing Fed. R. Evid. 1101(d)(3)). While D. Yazzie does not dispute some of the allegations made in the offense conduct section of the Presentence Investigation Report (dated January 27, 2011)("PSR"), as reflected in his multiple statements concerning the events of the night at issue, he does believe that the relevant facts are in dispute concerning his Objections to PSR. The Court makes the following factual findings:

1.       Concrete that is roughly an inch thick coats Tom's residence. See Transcript of Hearing at 65:6-19 (taken May 27, 2011)(Long, West)("May 27, 2011 Tr."); Transcript of Hearing at 7:7-25 (taken July 28, 2011)(Butcher, P. Yazzie)("July 28, 2011 Tr.").[2]

2.       D. Yazzie has a history of alcoholism. See Objections to PSR ¶ 17, at 8 (admitting this fact).

3.       Tom is D. Yazzie's uncle. See July 28, 2011 Tr. at 23:9-12 (Butcher, D. Yazzie).

4.       Tom and D. Yazzie had a good relationship before the incident involving the fire. See July 28, 2011 Tr. at 23:13-15 (Butcher, D. Yazzie).

5.       On the night of August 11, 2010, D. Yazzie was drinking alcohol with Tom and his other uncle, Irvin Gould. See July 28, 2011 Tr. at 23:19-24:9 (D. Yazzie).

6.       D. Yazzie drank to a significant level of intoxication on the night of August 11, 2010.

---

[2]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited version. Any final transcripts may contain slightly different page and/or line numbers.

See July 28, 2011 Tr. at 25:2-4, 28:1-2 (D. Yazzie).

       7.       After these men had been drinking, D. Yazzie got into a physical altercation with Tom and Gould.  See May 27, 2011 Tr. at 21:16-22:3; July 28, 2011 Tr. at 25:5-18 (D. Yazzie).[3]

       8.       D. Yazzie's nose bled to a significant degree after the altercation.  See July 28, 2011 Tr. at 26:5-13 (D. Yazzie, Butcher).[4]

       9.       After the altercation, Tom allowed D. Yazzie to take some alcohol with him.  See July 28, 2011 Tr. at 27:7-13 (D. Yazzie, Butcher).

       10.     D. Yazzie was angry after the altercation.  See July 28, 2011 Tr. at 27:11-13 (D. Yazzie).

       11.     D. Yazzie returned to Tom's residence later on in the night after the altercation.  See July 28, 2011 Tr. at 28:12-15 (D. Yazzie).

       12.     D. Yazzie brought with him a five-gallon plastic gas can with him to Tom's residence.  See July 28, 2011 Tr. at 28:2-4 (D. Yazzie).

       13.     The gas can had about three gallons of gasoline in it.  See July 28, 2011 Tr. at 28:4-5

---

[3]The United States contends that D. Yazzie initiated the altercation.  See May 27, 2011 Tr. at 21:16-22:3 (Long, West).  D. Yazzie contends that Tom and Gould initiated the altercation.  See July 28, 2011 Tr. at 25:5-18 (D. Yazzie).  The Court does not find it necessary to resolve this dispute in the evidence to address the issues that the Objections to the PSR raise, particularly given D. Yazzie's intoxication.

[4]The United States disputes to some degree the source of some of the blood from the altercation, contending that some of it may have come from the Tom and Gould.  See July 28, 2011 Tr. at 44:1-46:5 (Long, D. Yazzie).  D. Yazzie conceded at the hearing that some of the blood from the accident came from Tom and Gould, but asserted that most of the blood at the crime scene was his.  See July 28, 2011 Tr. at 44:1-46:5 (Long, D. Yazzie).  The parties do not dispute that D. Yazzie bled as a result of the altercation.  See July 28, 2011 Tr. at 44:1-46:5 (Long, D. Yazzie).

(D. Yazzie).[5]

14.     D. Yazzie did not bring a firearm with him when he returned to Tom's residence. See May 27, 2011 Tr. at 11:12-16 (Long, West).

15.     D. Yazzie did not believe that anyone was in Tom's residence at the time he started the fire.  See July 28, 2011 Tr. at 29:24-30:15 (Butcher, Yazzie).[6]

16.     D. Yazzie poured some gasoline on the concrete slab in front of Tom's front door to his residence and then ignited the gasoline.  See Objections to PSR ¶ 2, at 2 (admitting this fact); July 28, 2011 Tr. at 29:1-5 (D. Yazzie).

17.     D. Yazzie attempted three or four times to light a match to start the fire.  See July 28, 2011 Tr. at 41:21-25 (Long, D. Yazzie).

18.     D. Yazzie poured a small amount of gasoline on the windowsill of Tom's residence and into Tom's residence.  See July 28, 2011 Tr. at 29:11-18 (D. Yazzie).[7]

19.     D. Yazzie poured a small amount of gasoline on one of the corners of the house,

---

[5]The PSR does not specifically state how much gasoline was in the can.  See PSR ¶ 22, at 5.  The United States did not specifically question D. Yazzie on the amount of gasoline in the can at the hearing.

[6]At the July 28, 2011 hearing, D. Yazzie explained that he did not think Tom was home when he went back to Tom's residence because the house was dark and there was no movement inside the house.  See July 28, 2011 Tr. at 29:24-1 (Butcher, D. Yazzie).  D. Yazzie testified that Tom usually has a light on or at a minimum a radio going if he is home.  See July 28, 2011 Tr. at 10:1-3 (D. Yazzie).  D. Yazzie stated that he thought Tom had gone over to Gould's house, which is nearby. See July 28, 2011 Tr. at 30:4-8 (Butcher, D. Yazzie).  He stated that Tom would still have been able to see the fire from Gould's house, which is why he lit the fire.  See July 28, 2011 Tr. at 30:12:15 (D. Yazzie).

[7]The United States asserts that D. Yazzie consciously poured gasoline into the house.  See July 28, 2011 Tr. at 39:23-40:18 (Long, D. Yazzie).  D. Yazzie stated that he did not remember exactly what happened, and conceded that he had no reason to contest eyewitness testimony that he poured gasoline into the house.  See July 28, 2011 Tr. at 40:15-18 (Long, D. Yazzie).

which D. Yazzie set on fire.  See July 28, 2011 Tr. at 30:12-21 (D. Yazzie, Butcher); Defendant's

Exhibit C, filed May 25, 2011 (Doc. 38-1)("Exhibit C").[8]

      20.     The area near the windowsill and the front door of Tom's residence also caught on

fire.  See May 27, 2011 Tr. at 20:1-18 (Long, West).

      21.     D. Yazzie poured the remainder of the gasoline in the gas can on Tom's yard, which

D. Yazzie set on fire.  See May 27, 2011 Tr. at 51:13-52:6 (Butcher, West); July 28, 2011 Tr. at

31:9-21 (Butcher, D. Yazzie).

      22.     D. Yazzie did not intend to burn Tom's residence down.  See July 28, 2011 Tr. at

29:20-23, 31:24-32:5 (Butcher, D. Yazzie).[9]

      23.     D. Yazzie wanted to send a message to Tom by starting the fire.  See July 28, 2011

Tr. at 28:5-6 (D. Yazzie).

---

[8]In his reply, D. Yazzie does not concede that the mark on the corner of the house came from a fire.  See Defendant's Reply to the United States' Response to Mr. Yazzie's Sentencing Memorandum and Objections to the Presentence Report at 9 n.3 (Doc. 38)("Reply").  At the July 28, 2011 hearing, D. Yazzie stated that he poured some gasoline on one of the corners of the house. See July 28, 2011 Tr. at 30:12-21 (D. Yazzie, Butcher).  Given D. Yazzie's testimony, the mark on the corner of the house is more likely than not a scorch mark.

[9]The United States and the United States Probation Office ("USPO") dispute D. Yazzie's assertion that he did not intend to burn down Tom's residence given the eyewitness testimony of him pouring gasoline on the house, igniting the gasoline, and his conduct after he started the fire.  D. Yazzie testified at the hearing that he did not believe the house would burn down because of its concrete exterior, that he only wanted to send Tom a message, that he acted stupidly based on his intoxication, and that he did not believe that he poured enough gasoline to burn down the house. See July 28, 2011 Tr. at 28:1-6, 30:24-31:13, 53:11-4 (Butcher, D. Yazzie, Long).  Daily West, the criminal investigator who investigated the incident, said the fire would not likely burn the exterior of the home, but that there was some risk that the roof would catch fire.  See May 27, 2011 Tr. at 65:6-66:4 (Court, West).  West said there was no evidence D. Yazzie poured any gasoline on the roof, but that some of the clutter in the house had caught fire and that this fire might have reached the roof.  See May 27, 2011 Tr. at 66:5-10 (Court, West).  Given that D. Yazzie's conduct appears to constitute reckless as opposed to knowing conduct based D. Yazzie's testimony, the factual circumstances that support his testimony, West's testimony, and the small amount of gasoline D. Yazzie poured into the home, the Court concludes that D. Yazzie's testimony is credible.

24.     D. Yazzie did not believe, based on the nature of the concrete exterior of Tom's residence and the amount of gasoline he had poured, that his actions would result in burning down the house.  See July 28, 2011 Tr. at 30:24-31:4 (Butcher, D. Yazzie).[10]

25.     D. Yazzie's conduct in starting the fire was reckless in that it created a substantial risk of death or serious bodily injury to another person.  See Objections to PSR ¶ 9, at 4 (admitting this fact).

26.     Tom's residence was not destroyed.  See Defendant's Exhibit A, filed May 25, 2011 ("Exhibit A"); Tr. at 57:13-19 (Long)(United States admitting this fact).

27.     The fire singed Tom's front door, but did not destroy it.  See Defendant's Exhibit B, filed May 25, 2011 (Doc. 38-1)("Exhibit B").

28.     D. Yazzie had conflicts with Tom's dogs in the past, including these dogs killing his sheep and some of his chickens.  See July 28, 2011 Tr. at 32:19-33:18 (Butcher, D. Yazzie).

29.     D. Yazzie believed, based on his past experiences with the dogs, that they were vicious.  See July 28, 2011 Tr. at 32:19-33:18 (Butcher, D. Yazzie).

30.     Tom had not always tied the dogs up securely in the past.  See July 28, 2011 Tr. at

_____

[10]The United States contests D. Yazzie's assertion that he did not believe the house would burn down.  See July 28, 2011 Tr. at 53:6-54:4 (Long, D. Yazzie).  In its response, it argues that it is undisputed that D. Yazzie attempted to burn down the house.  See United States' Response to the Defendant's Sentencing Memorandum at 3 (Doc. 36)("Response").  The United States points to D. Yazzie's decision "to engage in disruptive behavior after he set the initial fire, including pouring gas on at least two other portions of Tom's house and attempting to blame his brother as the arsonist" as evidence that D. Yazzie intended to burn down the house.  See Response at 4.  The USPO also points to some testimony from eyewitnesses who described him as pouring gasoline inside and outside Tom's residence on the night in question.  See Addendum to the Presentence Investigation Report at 1, dated May 17, 2011 ("Addendum to PSR").  D. Yazzie offers a credible explanation, however, for his belief that the house would not actually burn down, based on the house's concrete exterior and the low amount of gasoline he poured on the house.  See July 28, 2011 Tr. at 30:24-31:4 (Butcher, D. Yazzie).  Indeed, most of the gasoline D. Yazzie poured in the yard rather than on the house.  See July 28, 2011 Tr. at 31:9-21 (Butcher, D. Yazzie).

33:8-18 (D. Yazzie).

      31.    D. Yazzie was afraid of the dogs on the night of August 11, 2010.  See July 28, 2011

Tr. at 33:22:23 (D. Yazzie).[11]

      32.    D. Yazzie killed Tom's two dogs on August 11, 2010.  See July 28, 2011 Tr. at

32:18-33:23 (Butcher, D. Yazzie).

## PROCEDURAL BACKGROUND

      In paragraph 36 of the PSR, the USPO imposed, pursuant to U.S.S.G. § 2K1.4(a)(1)(B), a

base offense level of 24, because "the offense involved the destruction of a dwelling."  PSR ¶ 36,

at 8.  The PSR states that D. Yazzie attempted to burn down Tom's residence.  See PSR ¶¶ 6-7, at

2. After the four-level enhancement under U.S.S.G. § 2K1.4(a)(1)(B), the base offense level is 24.

The PSR then reduced this offense level to 21 because of D. Yazzie's acceptance of responsibility

for the offense of conviction pursuant to U.S.S.G. § 3E1.1.  See PSR ¶¶ 42-43, at 8.  The PSR

calculated his advisory guideline range at 41 to 51 months imprisonment.  See PSR ¶ 90, at 21.

      D. Yazzie objects to this four-level enhancement in the PSR.  D. Yazzie objects to the

calculation of his base offense level of 24 pursuant to U.S.S.G § 2K1.4(a)(1)(B).  See Objections

to PSR at 1.  He contends that the correct base offense level should be 20 pursuant to U.S.S.G.

§ 2K1.4(a)(2)(A), which would result in a total offense level of 17.  See Objections to PSR at 1.  D.

Yazzie does not object to the calculation of the Criminal History Category.  See Objections to PSR

at 1.  D. Yazzie argues in the alternative that, if the Court does not sustain D. Yazzie's objections

---

      [11]The United States contends that the dogs were securely tied up and not likely to break free.
See July 28, 2011 Tr. at 47:10-48:17 (Long, D. Yazzie, Court).  Given Yazzie's past conflicts with
the dogs and his intoxication on August 11, 2010, the Court concludes that D. Yazzie's explanation
that he was afraid of the dogs on the night he killed them is credible.  In any case, the Court believes
it is more likely that the attack on the dogs demonstrates that D. Yazzie wanted to send a signal to
Tom than that he wanted to destroy his house.

to the PSR, he requests a 4-level downward departure and variance to a total offense level of 17, and the imposition of a sentence of 27 months.  See Objections to PSR at 1.

Yazzie contends that the PSR's application of U.S.S.G. § 2K1.4(a)(1)(B) controverts the plain and ordinary meaning of the word "destruction."  Objections to PSR ¶¶ 3-5, at 2.  He argues that the applicable guideline does not state that the offense "involved a dwelling" but that it requires "destruction of a dwelling."  Objections to PSR ¶¶ 6-7, at 3.  He points out that the PSR does not state that he destroyed Tom's dwelling.  See Objections to PSR ¶ 8, at 3-4.  D. Yazzie concedes that his conduct on the night in question was reckless in that it created a substantial risk of death or serious bodily injury to another person.  See Objections to PSR ¶ 9, at 4.  He points out that a separate guideline, U.S.S.G. ¶ 2K1.4(a)(2)(A), contemplates situations involving reckless behavior in the arson context, and demonstrates the United States Sentencing Commission's intent to punish intentional or knowing conduct more heavily by assigning a higher base offense level.  See Objections to PSR ¶¶ 6-10, at 3-5.  D. Yazzie notes that, for the U.S.S.G. § 2K1.4(a)(1)(b) to apply to this case, he would need the specific intent to destroy the dwelling to satisfy the attempt provision in this guideline.  See Objections to PSR ¶ 10, at 4-5.  Alternatively, D. Yazzie argues that the Court should downwardly depart or grant a variance, lowering his total offense level to 17, based on the circumstances of the case and Yazzie's alcohol and emotional problems.  See Objections to PSR ¶¶ 13-20, at 6-9.

The Addendum to PSR responds to D. Yazzie's objection by noting that the applicable guideline also covers the "attempted destruction of a dwelling."  Addendum to PSR at 1 (emphasis in original).  The Addendum to PSR reiterates the facts of the offense, stating that these facts demonstrate D. Yazzie's attempt to burn down Tom's residence.  See Addendum to PSR at 1-2.  The Addendum to PSR notes that some witnesses reported that they observed D. Yazzie pouring gasoline

-8-

inside and outside the residence.  See Addendum to PSR at 1.  The Addendum to PSR concludes that, had it not been for Gould running over to Tom's residence and putting out the fire with a garden hose, D. Yazzie's actions would have burned down the house.  See Addendum to PSR at 1-2. The USPO concedes that D. Yazzie did not destroy Tom's residence.  See Addendum to PSR at 1.

On May 10, 2011, the Plaintiff United States of America filed its Response.  The United States argues that the PSR properly calculated D. Yazzie's base offense level.  See Response at 3-4. The United States points out that the applicable guideline authorizes a base offense level of 24 when the defendant attempts to destroy a dwelling.  See Response at 3.  The United States contends that the facts of this case demonstrate that D. Yazzie had the specific intent to commit arson, particularly given that he fled from the scene of the crime and killed Tom's dogs.  See Response at 3-4.  The United States also notes that some witnesses stated that D. Yazzie poured gasoline into the residence through an open window.  See Response at 1.  The United States contends that D. Yazzie's decision to pour gasoline on Tom's residence and set it on fire demonstrate his specific intent to burn down the house.  See Response at 4.  The United States also points out that D. Yazzie blamed his brother for starting the fire.  See Response at 4.  Additionally, the United States argues that a downward departure or variance is not appropriate given the nature of the conduct involved.  See Response at 5-7.

On May 25, 2011, D. Yazzie filed his Reply.  He contends that the PSR solely relies on the theory of "involved the destruction of a dwelling" pursuant to U.S.S.G. § 2K1.4(a)(1)(B) to calculate his base offense level and that, consequently, the United States cannot now argue that the PSR authorizes calculating the base offense level based on an attempt theory because the United States never objected to the PSR.  Reply ¶ 1-3, at 2-3.  He asserts that neither the PSR nor the Addendum to the PSR alleges that he "knowingly created a substantial risk of death or serious bodily injury

pursuant to U.S.S.G. § 2K1.4(a)(1)(A)." Reply ¶ 3, at 2-3.

## RELEVANT RULES OF STATUTORY CONSTRUCTION

The United States Court of Appeals for the Tenth Circuit "interpret[s] the Sentencing Guidelines according to accepted rules of statutory construction." United States v. Nacchio, 573 F.3d 1062, 1066 (10th Cir. 2009). As the Supreme Court of the United States has recognized: "Statutory construction must begin with the language employed by [the writer] and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985). When a statute includes a term with a particular legal meaning based on prior precedent, courts presume that the drafter of the statute intended the term to have that particular legal meaning. See Clay v. United States, 537 U.S. 522, 527 (2003). In determining the meaning of a statute, courts look to the statute as a whole. See United States v. Atlantic Research Corp., 551 U.S. 128, 135 (2007). When a statute includes particular language in one section of a statute, but omits it in another section of the same act, courts generally presume that the drafter of the statute acted intentionally and purposefully in the including the language in one provision and omitting it from another. See Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 62-63 (2006). Lastly, courts must strive to interpret a statute so that it gives every word in that statute operative effect. See United States v. Nordic Vill., Inc., 503 U.S. 30, 35 (1992).

## LAW REGARDING APPLICATION OF U.S.S.G. § 2K1.4

U.S.S.G. § 2K1.4(a)(1)(A)-(B) assigns a base offense level of 24 to an arson offense "if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly," or "involved the destruction or attempted destruction of a dwelling." U.S.S.G. § 2K1.4(a)(1)(A)-(B) (emphasis added). U.S.S.G.

§ 2K1.4(a)(2)(A)-(B) assigns a base offense level of 20 to an arson offense "if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense," or "involved the destruction or attempted destruction of a structure other than (i) a dwelling" and certain other structures listed in subsection (a)(1).  U.S.S.G. § 2K1.4(a)(2)(A)-(B). As the United States Court of Appeals for the Seventh Circuit noted in analyzing these two provisions, a district court can "assign[] a base offense level of 20 or 24 depending on [the defendant's] state of mind."  United States v. Beyer, 106 F.3d 175, 179 (7th Cir. 1997).  The Seventh Circuit further articulated the distinction between these two subsections in United States v. Bader, 956 F.2d 708 (7th Cir. 1992):

> Although the sentencing guidelines do not define "knowingly," we doubt that the Sentencing Commission equated "knowing" with "should have known" or "could have concluded."  Knowledge in criminal law is actual consciousness.  "Should have known" is closer to negligence than to knowledge. . . .  "Knowledge" is cousin to "purpose"; both concepts exclude "should have known but didn't."  Nothing in the guidelines implies that the Commission used "knowingly" in a special sense; we conclude, then, that it has the usual meaning.  What the defendant should have known is not knowledge.

956 F.2d at 710 (emphasis in original)(citations omitted).  Likewise, the Tenth Circuit's criminal pattern jury instructions define knowingly as follows: "When the word 'knowingly' is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident."  Tenth Circuit Pattern Jury Instructions Criminal § 1.37, at 60 (2011).

Furthermore, the term attempt generally requires specific intent.  See United States v. Ballentine, 9 F.3d 109, 1993 WL 337742, at *4 (6th Cir. 1993)(unpublished table decision)(discussing the issue in the context of this arson guideline); United States v. Monholland, 607 F.2d 1311, 1318, 1320 (10th Cir. 1979)(holding that attempt requires specific intent to commit the offense together with performance of acts which constitute substantial steps towards its

commission).  The Tenth Circuit's criminal pattern jury instructions recognize that, "to prove an attempt, the government must prove beyond a reasonable doubt that . . . the defendant intended to commit the crime . . . ."  Tenth Circuit Pattern Jury Instructions Criminal § 1.32, at 51.

The New Oxford American Dictionary defines "destruction" as "the action or process of causing so much damage to something that it no longer exists or cannot be repaired."  New Oxford American Dictionary 473 (Angus Stevenson & Christine A. Lindberg eds., 3d ed. 2010).  There are no comments concerning the application of U.S.S.G. § 2K1.4(a)(1)-(2) in the sentencing guidelines. "Statutory construction must begin with the language employed by [the writer] and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. at 194.

## ANALYSIS

The PSR and the Addendum to PRS inaccurately conclude that D. Yazzie either destroyed or attempted to destroy Tom's residence.  The facts of this case indicate that, although Tom's residence suffered some damage, it has not suffered "so much damage . . . that it no longer exists or cannot be repaired."  New Oxford American Dictionary 473.  Moreover, the United States has conceded that D. Yazzie did not destroy Tom's residence.  See July 28, 2011 Tr.  at 57:13-19 (Long)(United States admitting this fact).  D. Yazzie also did not have the specific intent to destroy Tom's residence to satisfy the attempted destruction provision of U.S.S.G. § 2K1.4(a)(1).  While Yazzie concedes that he acted recklessly and created a substantial risk of death or serious bodily injury to others, the facts do not indicate that he did so knowingly.

D. Yazzie concedes that Tom's residence is a dwelling.  See Objections to PSR ¶ 2, at 2.  He contests the PSR's conclusion that he: (i) destroyed the dwelling; (ii) attempted to destroy the dwelling; or (iii) knowingly created a substantial risk of death or serious bodily injury to others.  The

Court agrees with D. Yazzie that the facts of this case do not indicate that he destroyed Tom's residence, attempted to destroy Tom's residence, or knowingly created a substantial risk of death or serious bodily injury to others.

As D. Yazzie correctly argues, a court should normally apply the ordinary meaning of terms in a statute.  See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. at 194.  The rules of statutory construction apply to the interpretation of the sentencing guidelines.  See United States v. Nacchio, 573 F.3d at 1066.  The New Oxford American Dictionary defines "destruction" as "the action or process of causing so much damage to something that it no longer exists or cannot be repaired." New Oxford American Dictionary 473.  While D. Yazzie caused some level of damage to Tom's residence, there is no indication that he caused so much damage to it that it no longer exists or cannot be repaired.  The photos D. Yazzie attached to his reply indicate that Tom's residence is still in a largely undamaged condition.  See Exhibit A; Exhibit B; Exhibit C.  Given that the outside of Tom's residence is a concrete material, it would have taken a much larger fire than the ones Yazzie started to destroy Tom's residence.  Applying the plain meaning of the term destruction leads to the conclusion that D. Yazzie did not destroy Tom's residence.  The United States has not proven by a preponderance of the evidence that D. Yazzie destroyed Tom's residence.  See United States v. Manatau, 647 F.3d 1048, 1054 n.2 (10th Cir. 2011)(noting that the preponderance-of-the-evidence standard applies during sentencing).  Furthermore, the United States has conceded that D. Yazzie did not destroy Tom's residence.  See July 28, 2011 Tr. at 57:13-19 (Long)(United States admitting this fact).

An attempt to commit an offense requires the specific intent to commit that offense.  See United States v. Ballentine, 9 F.3d 109, 1993 WL 337742, at *4 (discussing the issue in the context of this arson guideline); United States v. Monholland, 607 F.2d at 1318-20 (holding that attempt

-13-

requires specific intent to commit the offense together with performance of acts which constitute substantial steps towards its commission).  While D. Yazzie concedes that he acted recklessly, the facts do not indicate that he intended to destroy Tom's residence.  D. Yazzie was upset after his altercation with Tom and Gould.  The following facts, however, indicate that D. Yazzie did not specifically intend to destroy the residence: (i) the amount of alcohol he consumed; (ii) his past history of alcohol abuse; (iii) the relatively small amount of gasoline he used; (iv) the locations where he placed the gasoline; (v) that he poured most of the gasoline in the yard away from the home; (vi) that he knew that the outside of the house was made of concrete and would not likely burn down; (vii) that he had a relatively good relationship with Tom before the night of the fire. While it is true that, as the United States and the USPO point out, D. Yazzie poured some gasoline on the windowsill, he poured a small amount of gasoline there, and poured significantly more on the concrete slab and in Tom's yard.  Furthermore, based on the low likelihood that the house, based on its concrete exterior, would burn down unless the roof caught on fire, it does not appear D. Yazzie believed his actions would burn down the house.  The United States contends that D. Yazzie's killing of Tom's dog, flight from the scene of the crime, and decision to blame his brother for the fire demonstrate that he intended to burn down the house.  These facts, while unfavorable to D. Yazzie, permit a variety of inferences, including that, as to the dogs, D. Yazzie wanted to send a message, or, as to fleeing and blaming others, he sought to avoid arrest.  Furthermore, the United States does not demonstrate that a person acting recklessly would not also do these things.  Given the amount of alcohol D. Yazzie consumed, his past conflicts with these dogs, and the frequency which defendants try to avoid arrest as a general matter, this conduct alone does not demonstrate D. Yazzie specifically intended to burn down Tom's house.  The United States has not proven by a preponderance of the evidence that D. Yazzie attempted to destroy Tom's residence.  See United

States v. Manatau, 647 F.3d at 1054 n.2.

With respect to the issue of acting knowingly, the Seventh Circuit has articulated in the context of this arson guideline:

> Knowledge in criminal law is <u>actual</u> consciousness.  "Should have known" is closer to negligence than to knowledge. . . . "Knowledge" is cousin to "purpose"; both concepts exclude "should have known but didn't."  Nothing in the guidelines implies that the Commission used "knowingly" in a special sense; we conclude, then, that it has the usual meaning.  What the defendant should have known is not knowledge.

United States v. Bader, 956 F.2d at 710 (emphasis in original)(citations omitted).  The Tenth Circuit criminal pattern jury charge defining knowingly recognizes that a person knowingly performs an act when the "act was done voluntarily and intentionally, and not because of mistake or accident." Tenth Circuit Pattern Jury Instructions Criminal § 1.37, at 60.  While the facts indicate that D. Yazzie created a substantial risk of death or serious bodily injury to others, he did not do so knowingly.  D. Yazzie did not believe that anyone was in Tom's residence when he started the fire. While it was reckless for D. Yazzie to conclude no one was in Tom's residence and to start the fire even if he believed that no one was in the residence, knowledge in criminal law does not include what the defendant should have known.  See United States v. Bader, 956 at 710.  Furthermore, D. Yazzie reasonably did not believe that the house would burn down based on its concrete exterior. He also set the fire in locations where it was not likely to cause significant damage to Tom's residence.  The term knowingly has a specific legal meaning, and a court should presume that the Sentencing Commission knew of that particular legal meaning when it drafted the guidelines.  See Clay v. United States, 537 U.S. 522, 527; United States v. Bader, 956 F.2d at 710.  Applying that particular legal meaning, the Court concludes that D. Yazzie did not knowingly create a substantial risk of death or serious bodily injury to others.   The United States has not proven by a preponderance of the evidence that D. Yazzie  knowingly create a substantial risk of death or serious

bodily injury to others.  See United States v. Manatau, 647 F.3d at 1054 n

Because the Court concludes that the proper base offense level for D. Yazzie's conduct is 20 rather than 24, it is not necessary for the Court to address D. Yazzie's alternative argument requesting a downward departure or a variance.

**IT IS ORDERED** that the Defendants' Objections to the Presentence Report and, in the Alternative a Request for a Downward Departure and Variance, filed April 26, 2011 (Doc. 32), are sustained in part.[12]

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
  United States Attorney
Shana B. Long
  Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

John V. Butcher
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

   *Attorney for the Defendant*

---

[12]If necessary, the Court will address D. Yazzie's request for a downward departure and a variance at the sentencing hearing and in a subsequent sentencing memorandum.